May it please the Court, John Trabone representing the Simmonses, in this case the parents of the person that lost a child. Would the Court like to hear a brief explanation of the facts? Could I ask you just a quick question to make sure it's off my list? If I understand the record correctly, at the trial the plaintiffs agreed that certain officers could be dismissed, Stamp, Robertson, Nabors, Caldwell, and Peters. Yes. Were they dismissed? Yes. So they're out. They're out. We don't have to rule on that. That's right. It's only Sergeant Warren and the suit providers, Reynolds, Burke, and Sheriff Butler. And you're not raising any question about they should have been dismissed? No. We agreed that they should be dismissed. And, of course, the medical staff is also still in there. We agreed they'd be dismissed, but I don't know if there's an order of dismissal dismissing them. There is. Okay. Thanks very much. Thank you. Would the Court like to hear a brief recitation of the facts? No, thanks. I have a question. Yes. The standard for the constitutional claim is quite high, and I don't understand how the Simmonses meet it. It looks as though it may be a negligence case, but I don't understand why it's deliberate or willful disregard or I can't remember the exact buzzwords for the constitutional standard. So explain why. I know that they knew that the kid had attempted suicide. Yes. And I know that they had taken just normal. He didn't commit suicide with the normal suicide devices, shoelaces or something of that nature. Medical gauze is a new one. It is. Kind of hard to stop somebody who's bent on suicide. And I gather he was only alone there for an hour and some minutes. So why does it meet the constitutional standard? Your Honor, because there's a pervasive pattern of failing to meet an objective standard. The deliberate indifference standard, of course, is that there's a known suicide risk. No question here he's on a suicide watch. He had a suicide attempt. Were the guards, were the defendants aware of it? Everybody in this case was aware of it. There's no question about that. And then, of course, are they deliberately indifferent to that medical need? And there's no question that they were, I believe. No, there is a question. That's what I have a question about. What shows that they were deliberately indifferent? Your Honor, a pervasive pattern of not meeting their own guidelines, particularly the 15-minute welfare check guideline and the search guideline. Let's talk about the 15-minute. Well, weren't those guidelines, in effect, most of the time? And it is only this regrettable circumstance when there were nine other people on suicide watch and they weren't able to, in this particular moment, fulfill the 15-minute check? Well, the record shows that they hadn't been able to fill that 15-minute check since the mid-'80s. So for 20 years, they haven't fulfilled that 15-minute check. And they went into this particular shift on July 2nd, Sergeant Warren did, knowing that there's no way he could do that. Reynolds testified that if there were four people on suicide watch, you can't do it. How does it show deliberate indifference? Because they knew they couldn't meet it, and they knew they couldn't meet it for a long period of time. And I give you two cases that I think ---- I get it. Your theory is that if they're understaffed so that they can't meet their own guidelines, that shows deliberate indifference. Have I got it now? If they knew it for a long enough period of time that we know they're playing Russian roulette, then, yes, I believe that meets the standard. And I'd cite you to ñ there's a million cases here, but I'd cite you to two of them in particular. Giandotto v. Montgomery County, Eastern District of Pennsylvania in 1998. There, Mr. Mandy was suicidal, and there was a 15-minute check period, just like there is here. It's a national standard. They didn't check on him from 11 o'clock to 1 o'clock, and the court found there that they couldn't grant summary judgment in favor of the defendants because there was a jury question as to whether or not that was deliberately indifferent. When you know ñ Which case was that? It's Giandotto v. Montgomery County. That's in your brief? Yes, sir. I think it's cited in pages 53 and 54 of the opening brief. Incidentally, most jails I know of have big banks of television monitors where they look at what's going on in the cells. I gather this one didn't? Well, every cell did except for the one that this transfer juvenile was in, iPod. iPod had some cameras. S-1 and S-2 have cameras. Those are suicide cells. iPod is not a suicide cell. As the sheriff testified in this case, we have no place for a transfer juvenile. We have no adequate place to put him. It's unstable as a suicide cell. That's because ñ that's because they can't have him within sight or sound of adults? That's ñ certainly that's the one reason, because Arizona statute provides sight and sound separation. But the sheriff admitted we don't have any place for him. And we used to when we had the Winslow Jail, which was closed a few years earlier, Coconino County and Flagstaff got the funding for transfer juveniles, and they didn't transfer Mr. Simmons to that place. But there was a ñ there is funding in northern Arizona for transfer juveniles, but it isn't in Navajo County. So the other case I would cite you to on this particular point, this 15-minute watch period, and whether or not having a policy and failing to abide by it consistently, repeatedly, pervasively, is enough to deliver a difference, is Woodward v. CMS, which is the Seventh Circuit case in 2004, 368 F. 3rd, 917. And there they ñ the Court said the same thing. If you routinely do not follow your own policies, then you breach over and over and over on a pervasive, repeated basis your own policies, your own standard of care. That is a ñ leads to a jury question on deliberate indifference. And when you raised this question with Judge Campbell, how did he rule? I've never met Judge Campbell in this case. We had no argument on the summary judgment issue. He did it on the papers. Yes. It was in your ñ it was in your papers. Oh, of course. Yeah. Judge Campbell ruled on his 1983 issue. He had alternative grounds. One is the one you've just been arguing, that there was not a showing of deliberate indifference. But the other one was the failure to follow local rules. I assume that under ñ if he was correct in dismissing based upon failure to follow local rules, we wouldn't get to the other issue. I looked at his ruling, and it seemed to me that you did not follow the local rules. Do you see it otherwise? I do, although I humbly regret my tactical errors in this case. I don't believe any legal error was committed. Unfortunately, what I said when I filed my motion for summary judgment under Rule 56.1 is that we weren't going to discuss the facts of the case. And if you look at my summary judgment motion, perhaps a tactical mistake, but what we did is said we're setting them out in our separate statement of facts, and our summary judgment motion doesn't discuss the facts at all. The local rule, Part E, subpart E of that rule says, if you discuss the facts, please refer to the specific paragraph of the statement of facts. Right. We didn't discuss them at all. And I didn't read that rule as saying that you must summarize the statement of facts in the legal memorandum. And the rule doesn't say that. It says, if you do, please cite to those paragraphs. And ñ Well, if you're not going to cite any facts, and you're not going to rely on any facts, why, he would dismiss it for that reason. Well ñ I mean, you're going ñ these are things you always do in summary judgment. You state facts in law. All the local rule says is you just can't throw a big bundle up before the district judge. You've got to identify what you're relying upon. You had the same local rule when I was a district judge 25, 30 years ago. Well, Your Honor, the local rule says that you set out the facts that you rely upon. It says all ñ the rule says set out all the facts that you rely upon in your motion in a separate statement of facts. We did that. And it wasn't so cumbersome that it couldn't be read. That isn't the point. You're just saying that the judge can do it himself. But he's not the one that's supposed to do it. He's got other things to do. That's the lawyer's responsibility. We set them out. We filed a separate statement of facts. It's 20 pages in length. That's right. But you didn't indicate, did you, where in those statement of facts are that you're relying? Well, all of them. We relied ñ the rule says that the statement of facts should be the key facts that you rely upon for your motion for summary judgment. Our statement of facts is the key. And it's the key facts that we rely upon for summary judgment. So when a fact comes up in his mind, he's to read through the 20 pages and sort it out? Well, I suppose so. But there are 16 subsections. Would your argument be the same if you had given the judge a 600-page statement of facts? No. I think that's unwieldy. Here there's 20 pages. There's 21 pages, 25-page document. If you count the actual paragraphs that are substantive, it's 21 pages in length. We have 16 subsections. So if you have any question about any particular area, you look at the subsection. They're neatly organized. You can find them. It doesn't take a great deal of time to sift through our statement of facts. Now, I admit, unfortunately ñ I just had to ask you exactly what supports deliberate indifference. And you told me. It didn't seem very hard for you to tell me. No, Your Honor. And it wouldn't be hard to look at the facts that rely upon to support that either. Why not just tell them? Pardon? Why not just tell the judge? Well, I'm not sure what you mean. We did tell the judge. The judge complained that I didn't set out in our legal memorandum a summary of the statement of facts. I didn't know I had to. I didn't attempt to say which paragraph supported a finding of deliberate indifference with respect to any particular defendant, choosing instead to assert all facts against all defendants, leave it to the court to sort it out. I didn't provide a summary of the statement of facts in my legal memorandum. That's true. Counsel, I want to bring you to an issue you haven't raised yet in the oral argument, and that is this Arizona notice of claims statute. Yes, Your Honor. I think that it's relatively clear that Bacchus v. Arizona, the case decided on 319 of 09, clears that issue up. It expressly says that in there it's a wrongful death claim. It was a medical malpractice claim against two people who died in prison. Johnson was the other. Bacchus is one claimant. Johnson is the other. They cite Havasupai. There's four decisions from the court of appeals, two from Division I, two from Division II in Arizona, that are consistent with this, that say judges should not try to evaluate the sufficiency of the facts set forth in a claim letter to determine whether or not the amount of claims is sufficient. Well, then what are you asking for, for this Court to order a remand for reconsideration by the district court in the light of Bacchus, or just a flat-out decision on the law? Flat-out decision on the law. It's absolutely clear now that our claim letter was more than adequate. I mean, it was an 87-page claim letter. And the only fact that Navajo County complains about is that we asked for $20 million. And they're saying it's an unreasonable amount. More pages can make something less adequate instead of more adequate. I suppose it could, but it didn't in this case. What Bacchus says is you have to give a factual foundation for the State to evaluate your claim. We gave factual foundation about the Simmonses, their relationship to their son, and the life of the son. If they thought that $20 million was unreasonable, and obviously they did, they could evaluate that claim based upon the facts that we provided and reject it or negotiate it or honor it. There were enough facts before them to do that. Bacchus says all you have to do is give a factual foundation, and the trial court shouldn't be evaluating whether or not that claim was sufficient or not. As long as it was sufficient from the point of view of the claimant, it's sufficient. If you give any facts, any facts whatsoever, you survive. And what happened is the district court judges and some Arizona judges were kicking out claims that they didn't think you gave enough facts to support the amount demanded. Bacchus gets away with that and says no such thing. You don't do it anymore. And there's a host of other decisions since this case was decided that says so. In fact, in Vasquez, it's a high-speed chase where a 15-year-old son was killed. They demanded a certain amount of money, $750,000. There was no facts about the relationship of the parties, no facts whatsoever other than one was the mother. The court said, listen, a 15-year-old kid died. That's enough facts for us. That's enough to have the claim presented. We know what it's about. I only have one minute left. I'm going to reserve that time. Roberts. Yes, you may do so, counsel. We'll hear from the county. Good morning. May it please the Court. My name is Jim Jellison. I represent Navajo County and the former Navajo County Sheriff Gary Butler and the various employees that remain in this case. Counsel, I have a question for you about the state claims in the notice, negligence claims and related ones in the notice. According to the statute, it has to let the entity know the basis on which liability is claimed. And I know the answer to that from the notice, suicide. And it says specific amount for which the claim can be settled. And I know that. It states a dollar number. Facts supporting that amount. And it discusses them. These provisions are very common. We have one in Alaska. The Federal Tort Claims Act has one. Municipalities often have them. Frankly, I've never seen a statement of a notice of claim that was as extensive as the one submitted in this case. Usually they just say in one line the nature of the claim, an amount for which it can be settled, and maybe a sentence saying why they want that much money. And the only thing that can go wrong with them is if they're too low, because they're supposed to state an amount, typically, that is the peak of what the claim will go for. And then I look at the Backus decision, and it seems to read the notice of claim requirement real liberally. I don't understand why this shouldn't just be a remand on negligence and other State law claims because the notice of claim was just fine and the district court erred. Your Honor, as you stated, sometimes more pages is less in terms of the effectiveness of a notice of claim and more. Sometimes you understand less of what they're talking about the longer it goes on. And in this case, the fact that there were more pages meant that Navajo County knew less about what they were being requested to pay $20 million over. What was the mystery? A 17-year-old kid committed suicide in a cell after a previous suicide attempt. Let me explain what I mean by that more specifically. If you look at this very, very lengthy notice of claim, it includes very little comment, although it does include comment about grief that the parents experienced, but includes much more. But if you want discovery, you do discovery instead of settling. It includes much, much more material on the loss of Jasper Simmons and what he would have lost in terms of not having a family, not having a job, not earning income. And the problem with the notice of claim in this case, the backest does not resolve. And by the way, I agree backest presents a more liberal approach to the interpretation of the statute, more liberal than Deer Valley, the same Court's opinion in Deer Valley did. That seems obvious. It seems kind of obvious that it says this standard does not require reclaimant to provide an exhaustive list of facts. But what the Arizona Supreme Court has not resolved is this. And there are two issues that remain, which I think render Judge Campbell's opinion correct and his decision correct, is that when you've got a $20 million amount just appearing at the end of this very large notice of claim, the county doesn't know whether it's paying for the grief of the actual claimants, the Simmons parents, or some loss associated with the state of Jasper Simmons because the notice of claim, frankly, talks more about that than anything else. Oh, come on. They know the people will take $20 million to settle. They know perfectly well that it's not likely to take anything like that. And they know that the wrongful death claim is going to include whatever is claimable under Arizona law. And I would agree. They also know that the way the numbers are going to be arrived at is with an expert witness, expert economist. And I still think after Bactus, the notice of claim requirement provides more or requires more clarity, or at the very least, the Arizona Supreme Court hasn't addressed it. Now, there's another aspect. It says here, and I don't see anything new about it. I mean, this is the way notices of claims are typically construed all around a country. It says, And I'm not disagreeing with that. And it seems like you're saying they should. I don't think that. I think the Bactus decision certainly created a more liberal standard. I don't know if it created it. It seems to me it just reaffirmed what everybody's always thought about those things. The reason I say that is because Deer Valley, I think, emerged as a very strict interpretation of the statute, and it resulted in a lot of motions and litigation, in fact, including this motion. No question about it. And I think Bactus was not consistent. I think it adopted a more liberal approach, and it did what it did. The one thing that Bactus didn't do is retreat also from the notice of claim main purpose of not tolerating quick, unrealistic, and exaggerated demands. And if you look at the notices of claim in Bactus, and it's the same thing here. I didn't see where that was the purpose. I don't get it out of the statute or anything, really. I thought the purpose of these things, at least the way I've always seen them used, sometimes the State of Alaska would hire me. Basically, if they could settle the case before hiring me, great. They can save the money that I would cost them. And the notice of claim lets them try to do that. Well, the language I get about quick, unrealistic, and exaggerated demands are the prohibition that the Arizona Supreme Court talks about in Deer Valley itself. And your ---- Bactus was decided after Judge Campbell finished with this case, correct? Yes, sir. So Judge Campbell was relying upon the intermediate court cases, which were fairly difficult. I mean, they were a variety of different approaches. And if I understand you correctly, you think that Bactus still leaves open your argument. So are you suggesting that we remand this to have a decision made based upon Bactus' application? I think one reasonable argument is to allow Judge Campbell to make a determination as to whether this is a quick, unrealistic, and exaggerated demand that is prohibited by Deer Valley and to consider ---- Assuming he follows Deer Valley after Bactus. Let me ask one other question, if I could. We haven't touched upon the 88 case. And I'd like to ask you about that case, if I could, please. What do you claim was the disability with this young man? I don't claim that there was an 88. Okay. I understand. Would you comment upon the disability that's claimed by this young man? I'll start by commenting that that question ties in with the lack of facts that the that issue was even properly presented on summary judgment. I think there really is no evidence in the record that this young man suffered from a condition which meets the disability standards of the ADA. What about his depression? Well, there was a diagnosis of depression, but that doesn't necessarily mean that that condition substantially impacts a major life activity. And there was no ---- That's about a ---- depression doesn't just mean sad. A psychiatric diagnosis of depression has a very high mortality rate. It's a disease with a ---- I can't remember if it's 1 in 10 or something like that. I guess that's bipolar depression. But it has a very high mortality rate. It's a serious disease. Well, that's not in the record. And I'm not minimizing the impact of depression. But what I am saying is it hits different people in different ways. And I think with some people it can substantially impact a major life activity, and with others it might not. Actually, it doesn't. Sad, the blues, impacts different people in different ways. What psychiatrists call depression has a pretty typical pattern and course. But I think there needs to be something in the record to describe how the depression of some individual affects a major life activity of that individual in a substantial way. And that just wasn't here. It affects living. Yeah. Well, it can. It can. But the record's got to establish that. I mean, there really isn't anything in the record. All they need to do is get a little further than a dismissal for failure to file a notice of claim, and then they can develop a factual verdict. But this isn't a notice of claim. Well, that would presume that, of course, the only thing that remains is the state law claim. I think the judge was absolutely correct on the ADA for two reasons. Because, number one, there was nothing on the record to show that there was an ADA qualifying issue. But, number two, there was also nothing, and I mean absolutely nothing, in the record to suggest that anything that Navajo County did or that its personnel did was motivated by a belief that he was disabled or motivated by any limitation that he had. I mean, anything that he was restricted from doing was solely based on his presence on suicide watch, which would be an appropriate thing to do in order to prevent his suicide, which Navajo County took many, many steps to do. And the sight and sound rule. And the sight and sound rule, which hobbles Navajo County in many ways on what it can and cannot do. But, again, we're looking at a county that struggled, even with that sight and sound rule, to implement measures to assist in the protection of this young man. And we can't look at this case from the position that there was a suicide and, therefore, we're going to work backward and try to figure out ways that the county could have prevented this. And if we can figure those ways out, that means deliberate indifference. That's not the standard. When you look at what this county did for this young man, they took significant efforts in light of what some might have concluded was a superficial expression of intent to harm himself, but they took it seriously. When he cut his wrists on May 28, 2005, he was placed on level suicide, level one suicide watch, and enough things were taken from him for enough of a period of time that he was starting to tell his parents, wow, this is awfully restrictive. Counsel, what's your response to Mr. Trebon's assertion that there is a longstanding pattern of failure to observe the 15-minute rule? It's two things. Number one, there was a history and there is a history of the county at times finding it difficult because of personnel and operational issues to observe suicide watch inmates strictly on that 15-minute process. I don't know if the record supports that this is a consistent 20-year problem that affected every single inmate, and I doubt it did. There was certainly nothing in terms of prior suicides that occurred to alert the county that the manner in which they were implementing the policy was creating unreasonable risks that inmates would commit suicide. I think it is beyond dispute in this record, even looking at the record as I developed it, that they did not meet their 15-minute watches with Mr. Simmons. They observed him, I counted, in the logs 1,030 times in the six weeks that he was there. The day of his suicide, there were five visits, including the final visit where he was given his dinner. Sergeant Warren ensured that he had an extended family visit. Sergeant Warren had interaction with Mr. Simmons the day of his suicide, found him to behave normal, found him to behave cheerfully. His parents had, I think, an hour and a half or more, maybe a little more or less, interaction with Jesper Simmons the day that he unfortunately took his life, and they didn't detect anything unusual that would lead them to believe that that day he had any intention to do what he actually did. He was receiving his medication regularly. The nurse saw him that day. She didn't recall seeing anything unusual. And certainly an hour and 46 minutes passed before he was found, and that does mean that he was not observed every 15 minutes. But it's the things that were done that show that there was an absence of deliberate indifference. But, of course, I think clearly established law also has to play part of this analysis, and so far there is no case that says that if you do all of those things that I just talked about, involve a psychiatric nurse, administer medication, have daily nurse evaluations, provide for significant interaction with family, have frequent but maybe not 15-minute visits, that that is deliberately indifferent. Incidentally, was the kid ever seen by a psychiatrist? He was seen by the psychiatrist. I'm not asking about nurses and paramedics and whatnot. No. Even though he attempted suicide, they never gave him a psychiatric visit. As the record shows, a nurse practitioner who prescribed antidepressant medication, which he was taking at the time of his death. But no MD ever saw him? No, sir. And I believe I'm done with my time. Thank you, counsel. Thank you. Mr. Trayvon, you have about a minute. Thank you. Of course, he was never seen by a psychiatrist. He was seen by a nurse over from New York on a TV monitor. And she saw him on a TV monitor. You know, if you look at two cases. She wasn't there? She didn't see him personally? No. She was in New York. If you look at the decision in Sills v. Cartran, District of New Jersey, 2000 case, and you look at the decision in this case by this Court in Cabales v. Los Angeles, a 9th Circuit, 1988 decision, where you found, you upheld the decision of the jury in that case where Los Angeles jail was inadequate because they didn't have enough psychiatrists and psychologists on staff to meet the serious medical needs. Which case? It's Carbales v. Los Angeles. Is that in your brief? Open brief, page 53. Okay. And here he wasn't seen by anybody. And, Judge Wallace, I just want to mention, if you look at the 9th Circuit sanctioned cases, what we do, if I made a failing in this case, I apologize, nothing is the kind of thing that you would default the Simmonses out of a lawsuit. I was fading a little by the time I got to the 50s in the brief. I wish the good stuff had been earlier. Thank you. I'm sorry. You said he was seen by no one. He was seen by a nurse practitioner. Yeah. You didn't mean no one by that. You meant no trained psychiatrist. Absolutely. That's right. And she said in her deposition that he had a serious major depressive disorder was her language. He had a major depressive disorder. That qualifies as a disability under the ADA. But the question is whether that was negligence not to do it or whether it was deliberate indifference. With the pattern that we have in this case. No, no, you said about the psychiatrist not seeing. Look at your decision, Carbales. There, there was a lot more going on in Los Angeles than there was here, and they said it was a jury question about deliberate indifference. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Wallace, O'scannlain, Kleinfeld